OPINION
{¶ 1} This is an appeal by defendant-appellant, Matthew Exum, from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of robbery.
 {¶ 2} On February 3, 2005, appellant and a co-defendant, Jasin Justice, were indicted pursuant to a five-count indictment in connection with an incident on January 26, *Page 2 
2005. Under the indictment, appellant was charged with one count of robbery in violation of R.C. 2911.02(A)(2), a second-degree felony, and one count of robbery in violation of R.C. 2911.02(A)(3), a third-degree felony.
 {¶ 3} The matter came for trial before a jury beginning July 27, 2005. The first witness for the state was Evan Chakroff. On January 26, 2005, Chakroff, a student at the Ohio State University, was "deejaying" at the High Five bar, located near the intersection of Fifth Avenue and High Street. (Tr. Vol. I, at 83.) At one point during the evening, Chakroff went to the men's restroom, carrying a draft beer in a pint glass. Chakroff was standing at a urinal when a black male, wearing a hooded sweatshirt and jeans, entered the restroom, stood at the adjacent urinal, and began talking to him. The man, later identified as appellant, asked Chakroff for two dollars, stating that he needed gas money.
 {¶ 4} Chakroff, feeling awkward about the situation, stepped away from the urinal, thinking he could give the man "a dollar or some change to get him to leave me alone and so I could * * * leave the bathroom." (Tr. Vol. I, at 92.) Chakroff took his wallet from his back pocket and offered the man a dollar. The man refused the dollar, and again asked for two dollars. At that point, a white male, with scraggly red hair, entered the restroom.
 {¶ 5} Both men then advanced toward Chakroff, grabbed his clothing and pushed him up against the wall, causing Chakroff to drop the dollar bill and the beer bottle. Chakroff began yelling for help, prompting the white male to put his hand over Chakroff's mouth, while the black male reached around Chakroff and grabbed his wallet, tearing the back pocket of Chakroff's jeans in the process.
 {¶ 6} After the men obtained Chakroff's wallet, they exited the restroom. At about that time, Zak Colburn, the manager and bartender of the High Five bar, observed a *Page 3 
"scraggly looking white guy" in the hallway peeking around the corner. (Tr. Vol. I, at 159.) Colburn approached the man, but this individual immediately went out the back door of the bar. Chakroff then came out of the men's room and told Colburn, "I've been mugged." (Tr. Vol. I, at 160.) According to Colburn, Chakroff was "very upset." (Tr. Vol. I, at 161.)
 {¶ 7} Chakroff began dialing 911 on a cell phone, and Colburn went out the back door of the bar and observed a parked car with lights on and the engine running. Colburn recognized one of the occupants in the car as the white male he had seen in the bar; a black male was also in the car. Colburn memorized the license plate number of the vehicle, and Chakroff soon came outside to the parking lot and also observed the car. The black male, who was in the driver's seat, then put the vehicle in reverse and "gunned it." (Tr. Vol. I, at 169.) Colburn jumped out of the way, and the car sped down the alley. As Chakroff was speaking to a police officer on the phone, Colburn handed him a piece of paper with the license plate number written on it.
 {¶ 8} Columbus Police Officers Darren Egelhoff and Tim Pribe were on patrol that evening in an unmarked vehicle when they received a dispatch regarding a robbery at a bar. While in the vicinity of High Street and Fifth Avenue, the officers observed a green Ford Fairmont with a license plate number matching a number provided in the dispatch. The suspect vehicle turned from Fifth Avenue onto Hunter Avenue, heading southbound. At about that time, several marked police vehicles began pursuing the vehicle. Following a short pursuit, the suspect vehicle crashed into the back of a vehicle parked on the street.
 {¶ 9} A white male was apprehended at the scene following the collision. One of the officers subsequently observed a black male lying nearby in some bushes. At trial, *Page 4 
Columbus Police Officer Brett Johnson, who aided in the pursuit, identified appellant as the black male apprehended. Columbus Police Detective Gary Bowman testified that two wallets were recovered from the vehicle. Police officers eventually returned Chakroff's wallet to him, but his money was not recovered.
 {¶ 10} Shortly after the pursuit, Colburn and Chakroff accompanied police officers to the area where the two suspects had been detained, and Chakroff identified both suspects as the men who took his wallet. Colburn checked the license plate number he had written on the paper and it matched the license plate of the vehicle at the scene. At trial, Chakroff identified appellant as one of the individuals involved in the incident at the bar.
 {¶ 11} Jasin Justice, age 25, who was charged with appellant in the incident at issue, had previously been convicted of various theft, burglary, and drug charges. Justice gave the following testimony as to the events of January 26, 2005. Justice first met appellant on the night of the incident, when the two men began drinking and using drugs. Justice testified that it was appellant's idea to go to the High Five bar that evening. Appellant drove Justice to the bar, parking the car in the back of the bar. The two men entered the bar from the rear entrance. Justice walked down the hallway toward the front, but he looked back and saw appellant sticking his head out of the bathroom door, telling him to "come here." (Tr. Vol. II, at 252.)
 {¶ 12} Justice entered the bathroom and observed appellant talking to an individual. Appellant told the man they had run out of gas and needed some gas money. The man took out his wallet and gave appellant a dollar, but appellant grabbed the man and shoved him up against the wall. Appellant grabbed the man's wallet and ran out the *Page 5 
door. Justice, before also running out of the restroom, grabbed the man "by the head and swung him to the side[.]" (Tr. Vol. II, at 255.)
 {¶ 13} Justice and appellant left the bar through the back door; they got into the car and appellant drove away. Justice observed appellant pull out the man's wallet and throw it in the back seat of the vehicle. Appellant drove to a gas station and the men bought two beers. Shortly after leaving the gas station, they observed police lights, and appellant drove approximately one block before his vehicle collided with a parked car. Appellant got out of the car and ran. Justice, however, exited the vehicle, walked about five feet, and laid on the ground because officers were in pursuit.
 {¶ 14} Following the incident, in May of 2005, Justice had another encounter with appellant, during which appellant "told me that I was the only missing link to connect him to — to get him accused of this robbery and everything and that I was the only missing link, so I need to keep my mouth shut." (Tr. Vol. II, at 258-259.) Justice further testified that, approximately one week before trial, on July 27, 2005, he saw appellant on the third floor of the county jail, at which time appellant yelled to him, "You snitching bitch." (Tr. Vol. II, at 260.)
 {¶ 15} Appellant testified on his own behalf, acknowledging that his prior criminal record included arrests and convictions for possession of drugs, receiving stolen property, assault and burglary. He gave the following account as to the events of January 26, 2005. On that date, appellant was walking down Whittier Avenue when he noticed a car in a parking lot. The driver's door was open, and two white males were inside the vehicle. The driver exited the car and began walking past appellant. Appellant walked up to the *Page 6 
car and noticed Justice, who told him to get in. Appellant sat in the passenger seat and Justice drove away. Appellant had some crack cocaine that he shared with Justice.
 {¶ 16} Justice drove to a bar, and appellant told him, "Man, I'm not going in that white bar." (Tr. Vol. II, at 375.) Justice, however, told him to come inside, and appellant thought maybe he could panhandle some money in the bar. As they entered the bar, the men noticed an individual (Chakroff) entering the restroom. Both appellant and Justice then went into the restroom. Appellant asked the man if he could spare two dollars "for me and my buddy[.]" (Tr. Vol. II, at 379.) Eventually, the man pulled out his wallet, and offered him a dollar. Appellant responded, "Come on buddy. I know you can spare more than that." (Tr. Vol. II, at 380.)
 {¶ 17} Appellant then gave the following account of the events:
 And then as I went to take the dollar, he went to check his wallet again. And at this time I guess he noticed that there was nothing there. This was not a robbery. This was a theft, if anything, because the wallet — I seen him grab.
 He said, "Hey." And he turned with a gesture. And Mr. Justice tried to get from around him. That's when Mr. Chakroff grabbed him by the shirt and got to holding onto him like, hey, and all this screaming start.
 He said * * * "Give me my wallet back." * * * "Y'all, y'all got my wallet. Give me my wallet back. Give me my wallet back."
 I — that's when all three of us was aiming for the door. I aimed for the door because, number one, I'm in this all-white bar. Number two, I'm soliciting. Number three, this man is screaming bloody robbery. Number four, I'm on probation for robbery, so I'm trying to get out of this place quick as possible.
(Tr. Vol. II, at 380-381.) *Page 7 
 {¶ 18} Appellant denied ever reaching for Chakroff's wallet in his pocket, and he stated that he threw the dollar, offered by Chakroff, down on the floor. Appellant testified he "had no knowledge at all" that a robbery was going to occur. (Tr. Vol. II, at 387.) Rather, according to appellant, he "had the man with his wallet open. He freely gave me some money." (Tr. Vol. II, at 387-388.) After their vehicle crashed following the police pursuit, appellant admitted running from the scene because he "needed to get away from this again." (Tr. Vol. II, at 393.) Appellant acknowledged subsequently calling Justice a snitch.
 {¶ 19} Following deliberations, the jury returned verdicts finding appellant guilty of two counts of robbery. By entry filed August 3, 2005, the trial court merged the counts and sentenced appellant to eight years incarceration.
 {¶ 20} On appeal, appellant sets forth the following four assignments of error for review:
 FIRST ASSIGNMENT OF ERROR
 The trial court erred in admitting testimony that Appellant called his co-defendant a snitch while the two were incarcerated at the County Jail. The statements, which had no relevance to the underlying charges and were substantially outweighed by the danger of unfair prejudice, should have been excluded under Evid.R. 401, 402, and 403(A).
 SECOND ASSIGNMENT OF ERROR
 The prosecutor improperly commented upon Appellant's decisions to exercise his right to remain silent both following his arrest and after he consulted with his attorney. This violated Appellant's rights under the state and federal Constitutions. *Page 8 
 THIRD ASSIGNMENT OF ERROR
 The jury verdict was not supported by sufficient credible evidence and was against the manifest weight of the evidence. As a result, Appellant was denied due process protections under the state and federal Constitutions.
 FOURTH ASSIGNMENT OF ERROR
 The trial court erred in imposing the maximum sentence based on facts not found by the jury or admitted by appellant. This omission violated Appellant's rights to a trial by jury and due process under the state and federal Constitutions.
 {¶ 21} Under his first assignment of error, appellant contends the trial court erred by admitting evidence that he called his co-defendant a "snitch" at the time both men were incarcerated in the Franklin County Jail. Appellant notes that identification was not an issue in the case, and he contends the comments were not direct threats toward Justice. Appellant argues, therefore, that the evidence was not relevant to the charges, and that its use was improper under Evid.R. 403(A).
 {¶ 22} By way of background, over defense counsel's objection, the trial court allowed the prosecution to question Justice regarding an incident on July 27, 2005, during which he was standing in a hallway at the Franklin County Jail when appellant yelled at him, "You snitching bitch." (Tr. Vol. II, at 260.) Justice testified that appellant yelled loud enough "for probably another 50 people to hear it." (Tr. Vol. II, at 260-261.) Franklin County Deputy Sheriff Greg Goodrich also testified that he was on duty that day monitoring inmates being transported from the Franklin County Jail. Deputy Goodrich observed appellant in a hallway making a comment directed to Justice, also in the hallway, "about that inmate down there is a snitch." (Tr. Vol. II, at 341.) According to *Page 9 
Goodrich, the comment was loud enough for other inmates standing in the hallway to hear.
 {¶ 23} In response to appellant's challenge to the admission of this evidence, the state argues that the trial court properly admitted the testimony as consciousness of guilt. We agree. Under Ohio law, "evidence of threats or intimidation of witnesses reflects a consciousness of guilt and is admissible as admission by conduct." State v. Soke (1995),105 Ohio App.3d 226, 250, citing State v. Richey (1992),64 Ohio St.3d 353, 357. See, also, State v. Bonham (July 21, 1997), Licking App. No. 96 CA 121 (testimony by state's witness that defendant referred to another state's witness as a "snitch" admissible as consciousness of guilt).
 {¶ 24} While appellant contends that his comments were not threats, the conduct at issue, i.e., calling a fellow inmate a "snitch" in front of a number of other inmates, arguably constitutes an attempt to intimidate a witness. See, e.g., United States v. Currie (C.A.9, 1992), 974 F.2d 1343 (sentencing court did not err in finding that defendant attempted to intimidate government witness where testimony indicated that defendant, while being transported with inmate/informant to court, began shouting the informant's name and telling other inmates that the man was a "rat" and a "snitch"). Justice also testified that appellant told him, during an encounter in May of 2005, to keep his mouth shut. Here, appellant's attempts to intimidate the witness were "not `wholly independent' of the charged offenses," and his conduct, including the comments made in front of other inmates, was admissible as related to consciousness of guilt. Soke, supra, at 250.
 {¶ 25} Accordingly, the trial court did not err in allowing the admission of this evidence, and appellant's first assignment of error is overruled. *Page 10 
 {¶ 26} We will address appellant's second and third assignments of error in inverse order. Under his third assignment of error, appellant asserts there was insufficient evidence to establish the elements of second-degree robbery, as defined under R.C. 2911.02(A)(2). Appellant also argues that the verdicts were against the manifest weight of the evidence.
 {¶ 27} Sufficiency of the evidence and weight of the evidence are distinct legal concepts. State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617. In Sexton, at ¶ 30-31, this court discussed those distinctions as follows:
 To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process * * * and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. * * *
 A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly *Page 11 
lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * *
(Citations omitted.)
 {¶ 28} R.C. 2911.02 sets forth the offense of robbery, and states in relevant part as follows:
 (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
 * * *
 (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
 (3) Use or threaten the immediate use of force against another.
 {¶ 29} As noted under the facts, appellant was charged with robbery under both R.C. 2911.02(A)(2) and 2911.02(A)(3). Those two offenses involve "separate distinct elements." State v. Ellis, Franklin App. No. 05AP-800, 2006-Ohio-4231, at ¶ 7. Specifically, in contrast to R.C.2911.02(A)(2), which "requires proof of infliction or attempted infliction or threatened infliction of physical harm[,]" robbery, as defined under R.C. 2911.02(A)(3), "requires use or threatened use of force against another." Id. Accordingly, "[t]hese are distinct and separate acts and may be proven by essentially the same evidence but may be offenses of similar import." Id.
 {¶ 30} Appellant's primary contention is that that there was insufficient evidence to establish, pursuant to R.C. 2911.02(A)(2), that he attempted to inflict, or threatened to inflict, physical harm on another. Appellant raised this argument at the close of the state's *Page 12 
case-in-chief, by way of a motion for acquittal, pursuant to Crim.R. 29. The trial court denied the motion, finding there was sufficient evidence presented by the state as to an "attempt or a threat to inflict physical harm[.]" (Tr. Vol. II, at 356.)
 {¶ 31} In the present case, the state presented evidence showing that appellant, after refusing Chakroff's offer of a dollar, advanced toward Chakroff in the restroom of the bar. Both appellant and Justice grabbed Chakroff and pushed him against the wall, causing Chakroff to drop his beer bottle, as well as the dollar bill he had offered appellant. Chakroff called for help, but Justice put his hand over Chakroff's mouth, while appellant reached around Chakroff for his wallet, grabbing it and tearing the back pocket of Chakroff's jeans in the process. After appellant obtained the wallet, Justice grabbed Chakroff by the head and "swung him to the side" before exiting the restroom. (Tr. Vol. II, at 255.) The victim testified he "was in fear of physical harm" during the encounter because, having been grabbed, he was "afraid and thought they might hurt me[.]" (Tr. Vol. I, at 97.) Colburn, the bartender, stated that, when Chakroff emerged from the bathroom, "he was very [shook] up," and "very upset." (Tr. Vol. I, at 161.)
 {¶ 32} This court has previously held that the threat of physical harm need not be explicit; rather, an implied threat of physical harm is sufficient to support a conviction under R.C. 2911.02(A)(2).Ellis, supra, at ¶ 7. In the present case, construing the evidence most strongly in favor of the state, the trier of fact could have reasonably found that the actions of appellant and Justice, advancing on the victim in a confined area, grabbing him by his clothing, pushing him against the wall and pinning him there while appellant ripped the wallet from his pocket, conveyed a threat to the victim of impending physical harm if he offered resistance or failed to surrender his wallet. Upon review of the *Page 13 
evidence presented, the issue of whether appellant's conduct constituted a threat of physical harm was a question for the jury, and we conclude the evidence was sufficient for the jury to return a verdict of second-degree robbery.[1]
 {¶ 33} Further, we cannot conclude that the verdicts were against the manifest weight of the evidence. While appellant gave testimony that conflicted with the testimony of the state's witnesses, it was within the province of the trier of fact to assess the credibility of the witnesses and the weight to be given to their testimony. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The trier of fact obviously chose to believe the testimony of the victim, Chakroff, which was corroborated by the co-defendant, Justice, and we do not find that the jury clearly lost its way or created a manifest miscarriage of justice requiring reversal of the verdicts.
 {¶ 34} Accordingly, appellant's third assignment of error is without merit and is overruled.
 {¶ 35} Under his second assignment of error, appellant argues that the prosecutor improperly questioned him about his decision to exercise his right to remain silent, both following his arrest and after he consulted with his attorney. Appellant contends that the prosecutor's action was in violation of the principles set forth by United States Supreme Court in Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, and Griffin v.California (1965), 380 U.S. 609, 85 S.Ct. 1229. *Page 14 
 {¶ 36} During his direct testimony, appellant told the jurors: "I've been withheld to testify my side of the story[.]" (Tr. Vol. II, at 404.) On cross-examination, the prosecutor questioned appellant about this assertion, asking him whether the police had stopped him from telling his story. The prosecutor also asked appellant whether his (trial) testimony was "the first time you're sharing this story of aggressive panhandling[.]" (Tr. Vol. II, at 408.)
 {¶ 37} In Doyle, supra, at 619, the United States Supreme Court held that due process prohibits the government's use of a defendant's post-arrest, post-Miranda silence for impeachment purposes. The rationale for such a prohibition is that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id., at 618. The United States Supreme Court subsequently made clear, however, that due process is not violated by the prosecution's impeachment of a defendant's testimony by reference to the defendant's pre-arrest, or post-arrest, but pre-Miranda silence. Fletcher v.Weir (1982), 455 U.S. 603, 607, 102 S.Ct. 1309 ("In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law * * * to permit cross-examination as to postarrest silence when a defendant chooses to take the stand").
 {¶ 38} This court has previously noted that "the actual administration of Miranda warnings, rather than arrest and custodial interrogation, triggers the constitutional protection." State v. Price (Jan. 31, 1995), Franklin App. No. 94APA07-1012. Therefore, "absent Miranda warnings, there is no government action which induces a defendant to remain silent with an assurance that his silence would not be used against him." Id. *Page 15 
See, also, United States v. O'Keefe (C.A.11, 2006), 461 F.3d 1338, 1347
("[t]he due process considerations addressed in Doyle are only implicated by the giving of a Miranda warning"). In the instant case, the state notes, and we agree, that the record does not reveal whether appellant was given Miranda warnings.
 {¶ 39} In State v. Cooper (Nov. 18, 1999), Cuyahoga App. No. 75282, the defendant argued that her constitutional rights were violated by the prosecutor's use of her post-arrest silence for impeachment purposes during cross-examination, and that the state improperly referred to her silence during closing argument. Under the facts of Cooper, there was "no evidence as to when the appellant was advised of herMiranda rights." Id. The court noted that, in a prior case, State v.Thomas (Apr. 4, 1996), Cuyahoga App. No. 68130, it had analyzedFletcher, supra, "and held that no Doyle violation occurs where there is no evidence that Miranda warnings were given and the defendant elected to testify on his own behalf." The Cooper court similarly found that, where appellant chose to take the stand in her own defense, "her testimony was open to impeachment." Cooper, supra. See, also, UnitedStates v. Hopkins (C.A.4, 2006), 197 Fed.Appx. 235, 238-239 (where the record is devoid of evidence that government agents offered any assurances to defendant that his silence would not be used against him, there was no error under Doyle in allowing prosecutor to question him regarding his failure to provide a statement to investigators). Similarly, in the instant case where appellant took the witness stand in his own defense, inasmuch as the record is silent as to when (or whether) appellant received Miranda warnings, we are unable to conclude that a Doyle violation occurred. Cooper, supra. *Page 16 
 {¶ 40} We also note that this is not a case in which the prosecution, on its own initiative, commented on appellant's silence. Rather, appellant invited the questioning on cross-examination by testifying, during direct examination, that he had been "withheld" from presenting his story. Under such circumstances, courts have found no Doyle
violation. See State v. Lee (Dec. 31, 1997), Trumbull App. No. 95-T-5371(Doyle inapplicable where appellant's attorney facilitated the presentation of the testimony referring to appellant's silence after being given Miranda rights; "admission of such testimony is not reversible error, since it was invited by the questioning of appellant's attorney"); State v. Eason, Belmont App. No. 02 BE 41, 2003-Ohio-6279, at ¶ 111 (no Doyle violation where appellant attempted to show he was denied opportunity to explain his version; "[t]he state cannot be expected to forego commenting on a defendant's post-arrest silence when the defendant himself testifies about that silence as part of his defense"). See, also, United States v. Robinson (1988), 485 U.S. 25,108 S.Ct. 864 (defendant's Fifth Amendment rights not violated by prosecutor's comments on failure of defendant to testify in response to defense counsel's closing argument that government had not allowed defendant to tell his side of the story); State v. Champion (2005), 134 Cal.App.4th 1440, 1450-1451 (no Doyle violation where prosecutor sought to rebut defendant's claim he had not been given an opportunity to tell his side of the story; prosecutor was not taking unfair advantage of defendant's exercise of his constitutional right to remain silent but, instead, prosecutor's inquiry was a fair response to defendant's claim).
 {¶ 41} Finally, we note that challenges under Doyle, supra, are subject to harmless-error analysis. See State v. Thomas, Hamilton App. No. C-010724, 2002-Ohio- *Page 17 
7333, at ¶ 13 ("Doyle violations are reviewed under a harmless-error standard"); State v. McMillion, Ashtabula App. No. 2005-A-0016,2006-Ohio-3229, at ¶ 27 (same). In the present case, as acknowledged by appellant, identification was not at issue. The state presented the testimony of the victim, who unequivocally testified that appellant shoved him against the restroom wall and ripped the wallet from his back pocket; the co-defendant, Justice, corroborated the victim's testimony, and appellant himself admitted to having committed a "theft" offense. Following the chase by police officers, the victim identified appellant at the scene of the car accident. In light of the evidence presented, we cannot conclude that the outcome of the trial clearly would have been different had this line of inquiry by the prosecution not been presented, and, thus, any potential error is harmless beyond a reasonable doubt.
 {¶ 42} Based upon the foregoing, appellant's second assignment of error is without merit and is overruled.
 {¶ 43} Under his fourth assignment of error, appellant asserts that the trial court erred in imposing a maximum sentence based on facts not found by the jury or admitted by appellant as violative of Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, and Apprendi v. NewJersey (2000), 530 U.S. 466, 120 S.Ct. 2348.
 {¶ 44} Subsequent to the time of appellant's sentencing, the Ohio Supreme Court decided State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, in which the court applied Blakely and Apprendi to Ohio's sentencing statutes, declaring unconstitutional those statutes requiring judicial fact-finding, and severing such provisions from Ohio's sentencing laws.State v. Dennis, Franklin App. No. 05AP-1290, 2006-Ohio-5777, at ¶ 37. In Foster, the Ohio Supreme Court "broadly applied its holding to all cases pending on *Page 18 
direct review." Dennis, at ¶ 37. However, following the decision inFoster, this court has held that "a defendant sentenced afterBlakely `who did not assert a Blakely challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on Foster.'" Id., quoting State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio 2445, at ¶ 7.
 {¶ 45} Blakely was decided on June 24, 2004. In the instant case, the trial court conducted appellant's sentencing hearing on August 1, 2005, and appellant's counsel did not raise error in the trial court based upon Blakely. Accordingly, having failed to raise this issue before the trial court, appellant has waived this argument on appeal as to his maximum sentence, and he is not entitled to a re-sentencing hearing.Draughon, supra.
 {¶ 46} Accordingly, appellant's fourth assignment of error is without merit and is overruled.
 {¶ 47} Based upon the foregoing, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
 McGRATH and DESHLER, JJ., concur.
DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Although it is not entirely clear whether appellant also challenges the sufficiency of the evidence regarding his conviction under R.C. 2911.02(A)(3), we find that the state presented sufficient evidence to sustain that conviction. R.C. 2901.01(A) defines "force" as "any violence, compulsion or constraint physically exerted by any means upon or against a person or thing." Here, a rational trier of fact could find that appellant directed force toward the victim by pushing him up against the wall and tearing his wallet loose from his back pocket, and, thus, the evidence also supports the jury's verdict under R.C.2911.02(A)(3). *Page 1